UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STONCOR GROUP, INC.,

    Plaintiff,

v.

CHRISTOPHER CAMPTON, et al.,

    Defendants.

CASE NO. C05-1225JLR

ORDER

## I.  INTRODUCTION

This matter comes before the court on Plaintiff StonCor Group, Inc.'s ("Stonhard")[1] Motion for Preliminary Injunction (Dkt. # 27). Having read the papers filed in connection with this motion, and having heard oral argument, the court DENIES Plaintiff's motion.

## II.  BACKGROUND

Stonhard seeks a preliminary injunction restraining its former employee, Defendant Christopher Campton, and his new employer, Defendant Hi-Tech Interiors, Inc. ("Hi-Tech"), from (1) competing with Stonhard, and (2) using Stonhard's trade secrets and confidential information, including its customer lists, installer lists, and pricing policies. Stonhard argues that Campton has breached the covenant not to compete contained in his 1989 employment contract and violated Washington's Uniform Trade

---

[1] Although StonCor Group, Inc. filed suit, Plaintiff's claims relate to its Stonhard division.

ORDER – 1

Secrets Act.[2]  Campton denies these allegations, contending that his 1990 employment contract superseded the 1989 contract and that his covenant not to compete expired.

Campton worked in various positions at Stonhard from September 1984 until his resignation on April 15, 2005.  In February 1989, Stonhard promoted Campton to Field Services Manager for the Northwest, making him responsible for training and supervising Territory Managers and project engineers, monitoring sales and profitability, and indirectly supervising installers and vendors.  As part of his promotion, Stonhard required Campton to sign a new employment agreement providing in relevant part,

> I recognize that upon my termination of my employment with Stonhard, I will have the right to work for a Stonhard competitor . . . only in California and only if I don't use any of Stonhard's Confidential Information . . . .  I further agree that if I move my residence to outside California during the one (1) year period following termination of my employment with Stonhard, I shall refrain from competing with Stonhard for such one (1) year period in any state which is . . . in the Pacific time zone.

Neill Decl., Exh. B.  In addition, the agreement provided that Campton's obligation to refrain from competing with Stonhard "SHALL SURVIVE TERMINATION OF THIS AGREEMENT FOR SO LONG AS SUCH INFORMATION IS NOT GENERALLY KNOWN BY THE PUBLIC AT LARGE."  Id. (capitalization in original).  Both the employment agreement and Stonhard's Code of Conduct (signed by Campton at the same time) define confidential information, *inter alia*, as its customer lists, installer lists, and pricing information.  Id.; Exh. C.

A year later, Stonhard reassigned Campton to Territory Manager for Seattle and National Account Manager for Costco Wholesale Corporation ("Costco").  As a Territory Manager, Campton was responsible for selling Stonhard flooring, evaluating projects, subcontracting labor, and providing customer service.  Campton's boss at the time,

---

[2] While Stonhard's complaint raises other claims, its motion for preliminary injunction focuses primarily on these two claims.

ORDER – 2

Marshall Liverman, sent him a brief memorandum confirming the reassignment and details of his new compensation plan. Liverman Decl., Exh. 1. Campton sent Liverman a memorandum accepting the position and listing nine specific terms of the agreement on March 2, 1990. Id., Exh. 2. Neither memorandum discussed a confidentiality agreement or covenant not to compete. Around the same time, Campton alleges that he told Liverman that he did not want to be bound by a noncompete clause because of his new, commission-only position. According to Campton, Liverman acknowledged his concerns and stated that he needed to check with Stonhard's personnel and corporate departments. Liverman, however, has no recollection of this conversation and Stonhard strongly disputes allowing such an arrangement. Regardless, Stonhard sent Campton a new employment agreement reflecting his reassignment as Territory Manager on May 2, 1990, which prohibited Campton from competing in the Seattle territory for three years, and anywhere else in the country for one year after his termination. Campton Decl., Exh. 5. Although Stonhard asked Campton to sign and return the 1990 agreement, Campton refused to sign it and Stonhard never asked for it again. Campton continued working for Stonhard for the next 15 years, returning to the Field Sales Manager position in June 2001 and becoming the Territory Manager again in August 2003.

As Stonhard's national account manager for Costco, Campton negotiated pricing with Costco on an annual basis, and coordinated new construction and maintenance of Stonhard flooring in Costco warehouses throughout the country. Since July 1988, Stonhard has served as Costco's exclusive provider of polymer flooring and received $2 million in annual revenues from Costco over the last three years. Stonhard alleges that Campton had unique access to and knowledge of Stonhard's customer information, installer network, and pricing policies. Stonhard provided Campton, as well as its other Territory Managers, with a "P-file" developed by Stonhard's direct sales force containing

ORDER – 3

information about existing and prospective customers within their territory, including contact information, job history, price quotes, and profitability. Further, Campton coordinated the installation of Stonhard floors by relying on Stonhard's exclusive, nationwide installer network, developed over the last 22 years.[3] Stonhard considers its customer information, installer network, and pricing policies confidential and withholds them from the public.[4]

In April 2004, Campton began negotiating a new position with Hi-Tech's President, Ben Warner. Through a series of e-mails and conversations, Campton and Warner discussed forming a business model that would make Hi-Tech "a major player in the epoxy market," a subset of polymer flooring. Salgado Decl., Exh. A-F. Campton stayed with Stonhard, however, for the next year, resigning in mid-April 2005 and starting with Hi-Tech a week later. On April 26, 2005, Campton made a sales presentation to Costco on behalf of Hi-Tech, which included one of Stonhard's installers as a potential vendor. During the presentation, Costco decided to end its 17-year relationship with Stonhard and begin working with Hi-Tech, largely based on its relationship with Campton and his promises that he had "good installation people." Campton Dep. at 142-43; Moayeri Dep. at 10-11. According to Costco's building manager, Hi-Tech offered "very competitive" prices compared to Stonhard. Moayeri Dep. at 57. Consequently, Campton met with General Polymer, a floor manufacturer, to "discuss the right product mix with regard to particular environments within Costco."

---

[3] Stonhard alleges that it has invested considerable time evaluating and selecting installers, and providing them with specialized training and assistance through a password-protected website. Stonhard also allegedly offers installers equipment and business loans at no interest, and terminates installers who work for its competitors.

[4] Stonhard maintains its customer list and installer network on a password protected computer program.

ORDER – 4

Campton Dep. at 140. Although Campton admits to meeting with other Stonhard customers and installers on Hi-Tech's behalf, he contends that he began anew with Hi-Tech and has generated customer and installer information from phone books, Harris guides, telephone directories, the internet, and leads from materials vendors.

Through recent discovery and internal review, Stonhard learned that a week after Campton's resignation and a few days before the Costco sales presentation, someone using Campton's unique network identifier and password accessed its secure "Sales Force Automation" website containing information about Stonhard's customer accounts, installers, pricing, and contacts. Patti Decl., Exh. A. In addition, Stonhard learned that at least three Stonhard installers are booked to install flooring on upcoming Costco projects.[5]

### III.   DISCUSSION

**A.   Legal Standard**

To obtain a preliminary injunction, the moving party must demonstrate (1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) that serious questions exist and the balance of hardships tips in its favor.[6] Save Our Sonoran, Inc. v. Flowers, 408 F.3d 1113, 1120 (9th Cir. 2005); see also Fed. R. Civ. P.

---

[5] Stonhard also received discovery indicating that as of March 22, 2005 – nearly one month before Campton's resignation – MulvannyG2 (Costco's architect) replaced Stonhard on Costco's approved national vendor list with Hi-Tech and listed Campton as its contact. Campton, however, disputes this evidence and provides a declaration from MulvannyG2 alleging the change occurred after he resigned, on May 24, 2005. Jones Decl. at ¶ 6.

[6] Although this test is commonly known as the "alternative test," the Ninth Circuit also employs the "traditional test," requiring the court to find that "(1) the moving party will suffer irreparable injury if the relief is denied; (2) the moving party will probably prevail on the merits; (3) the balance of potential harm favors the moving party; and (4) the public interest favors granting relief." Cassim v. Bowen, 824 F.2d 791, 795 (9th Cir. 1987). Here, Stonhard relies on the first prong of the "alternative test" to support its motion for a preliminary injunction.

ORDER – 5

65.  The two prongs of the alternative test are not separate inquiries, but rather "extremes of a single continuum."  Clear Channel Outdoor, Inc. v. City of Los Angeles, 340 F.3d 810, 813 (9th Cir. 2003).  Consequently, "the required degree of irreparable harm increases as the probability of success decreases," Flowers, 408 F.3d at 1120.  Given that preliminary injunctions are "an extraordinary and drastic remedy," courts refrain from granting them unless the moving party carries the burden of persuasion by a "clear showing."  Mazurek v. Armstrong, 520 U.S. 968, 972 (1997).  On appeal, a district court's order regarding preliminary injunctive relief is "subject to limited review and will be reversed only if the district court 'abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact.'" Flowers, 408 F.3d at 1120-21 (quoting United States v. Peninsula Commc'ns, Inc., 287 F.3d 832, 839 (9th Cir. 2002)).

**B.     Probable Success on the Merits**

Although Stonhard alleges multiple claims against Defendants, it seeks a preliminary injunction based on its breach of contract and trade secrets claims.  After considering the merits of both claims, the court finds that Stonhard demonstrates a low likelihood of success on its breach of contract claim and a significantly stronger showing on its trade secrets claim.  Stonhard's breach of contract claim revolves around the enforceability of Campton's 1989 covenant not to compete.  While Campton's 1989 Field Services Manager employment contract restrained him from competing against Stonhard, Campton's reassignment and negotiation of a subsequent employment contract for the Territory Manager position most likely superceded the 1989 contract.  See Higgins v. Stafford, 866 P.2d 31 (Wash. 1994) ("when two contracts are in conflict, the legal effect of a subsequent contract made by the same parties and covering the same subject matter, but containing inconsistent terms, is to rescind the earlier contract.  It becomes a

ORDER – 6

substitute therefor, and is the only agreement between the parties upon the subject.") (internal quotations and citations omitted).

Here, both contracts governed the same subject matter, Campton's employment with Stonhard, but conflicted in terms of position, compensation, job responsibilities, and confidentiality provisions. Stonhard, contrary to its argument here, clearly considered Campton's reassignment to Territory Manager to be a new position, complete with different job responsibilities and changed compensation. The memoranda exchanged by Campton and his boss negotiating the terms of his new position as Territory Manager, the new employment contract sent to Campton, and Stonhard's practice of having Field Services Managers and Territory Managers sign separate employment agreements all confirm this change. Although Stonhard intended that Campton not compete against it for three years after his termination in Seattle, and for one year anywhere else in the country, as evidenced by the 1990 employment agreement, Campton refused, failing to sign and return the agreement. Stonhard ratified Campton's conduct by continuing to accept his services and compensating him for the next 15 years without ever seeking a covenant not to compete again. Based on the facts before the court at this preliminary stage and the law, the court finds that Campton's 1989 employment contract was likely superceded and that Stonhard has demonstrated a low probability of success on its breach of contract claim.

In contrast, Stonhard demonstrates a strong likelihood of success on its trade secrets claim. Stonhard's customer files, the pricing information contained in them, and its installer network all likely qualify as trade secrets. Under RCW § 19.108.010(4), a trade secret is information that (1) derives independent economic value from not being generally known to, or readily ascertainable by, the public, and (2) is subject to reasonable efforts to maintain its secrecy. State and federal courts have held that

ORDER – 7

customer, supplier, and vendor lists are protected trade secrets.  E.g., Ed Nowogroski Ins., Inc. v. Rucker, 971 P.2d 936, 943 (Wash. 1999) (customer list); Yeti by Molly, Ltd. v. Deckers Outdoor Corp., 259 F.3d 1101, 1108 (9th Cir. 2001) (supplier list); Sigma Chemical Co. v. Harris, 794 F.2d 371, 373-74 (8th Cir. 1986) (product and vendor lists).  The fact that these lists might contain certain information that is publicly available does not exempt them from trade secret protection.  Boeing Co. v. Sierracin Corp., 738 P.2d 665, 675 (Wash. 1987).  Courts applying Washington trade secret law may enjoin an "[a]ctual or threatened misappropriation" of a trade secret.  RCW § 19.108.020(1).  Misappropriation occurs when a person discloses or uses a trade secret which the person knew, or had reason to know, was "acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use."  RCW § 19.108.020(2)(b)(ii)(B).

      Here, Stonhard's customer files, the pricing information contained in them, and installer list are likely protected trade secrets.  The customer and installer lists are a compilation of information, largely unknown to others, that Stonhard has attempted to keep secret by limiting their distribution[7] and maintaining them on a password-protected computer program.  All Stonhard employees, including Campton, sign a Code of Conduct identifying its customer and installer lists as confidential information.  Campton admitted at his deposition that Stonhard's "P-file," containing, *inter alia*, customers' job history, preferences, price quotes, and future needs, is confidential.  The pricing information contained in Stonhard's "P-file" and other customer files is also likely protected as a trade secret, given that it is based on confidential information such as Stonhard's profitability, the customer's willingness to pay for certain services and products, and whether the customer receives a discounted or premium rate.  Both Stonhard's customer lists and

---

[7]Stonhard limits its distribution of both lists to Territory Managers and Field Services Managers by specific territories and regions.

ORDER – 8

nationwide installer network represent a significant investment of time and resources, resulting from decades of developing customer relationships, identifying qualified installers and providing those installers with specialized training.[8]  Although Campton argues that certain information contained in Stonhard's customer and installer lists is readily ascertainable through other sources, Stonhard "need not prove that every element . . . is unavailable elsewhere." Serracin, 738 P.2d at 675.  Campton falls far short of showing that all of the information contained in Stonhard's customer list and installer network is available through alternative means.  Thus, Stonhard's customer files, the pricing information contained in them, and installer list all likely qualify for trade secret protection.

Further, Stonhard has brought forth strong evidence that Campton misappropriated its trade secrets.  A week after resigning and a few days before the Costco sales presentation, someone using Campton's unique identifier and password accessed Stonhard's secure "Sales Force Automation" website containing customer account, pricing, and contact information, as well as a link to information about Stonhard's installers.  A few days later, Campton listed one of Stonhard's installers as a potential service provider on Costco projects.  Although Costco's building manager testified that Costco replaced Stonhard with Hi-Tech based on its 15-year relationship with Campton and his promises that he had good installers, the building manager also testified that Campton offered "very-competitive" prices compared to Stonhard.  Since winning Costco's business, Campton has booked three of Stonhard's largest installers to work on

---

[8]According to Stonhard, having skilled installers is key, as evidenced by Costco's single question for Campton at the April 26, 2005 sales presentation: "[D]o you have good installation people?"

ORDER – 9

nine new Costco projects.  Taken together, the evidence demonstrates a strong likelihood of Campton's actual or threatened misappropriation of Stonhard's trade secrets.

**C.    Irreparable Harm**

Given that Stonhard has demonstrated a strong likelihood of success on the merits, the required degree of irreparable harm it must show is decreased.  <u>Flowers</u>, 408 F.3d at 1120.  Stonhard, however, must demonstrate some degree of irreparable harm.  <u>See</u> <u>Los Angeles Mem'l Coliseum Comm. v. Nat'l Football League</u>, 634 F.3d 1197, 1202 (9th Cir. 1980) ("at least a minimal tip in the balance of hardships must be found even when the strongest showing on the merits is made").  In general, the basis for preliminary or permanent injunctive relief in federal court is "irreparable injury" and "the inadequacy of legal remedies."  <u>Weinberger v. Romero-Barcelo</u>, 456 U.S. 305, 312 (1982).  The Supreme Court has stated:

> [T]he temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury. . . . The key word in this consideration is irreparable.  Mere injuries, however substantial, in terms of money, time and energy necessarily expended . . . are not enough.  The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

<u>Sampson v. Murray</u>, 415 U.S. 61, 90 (1974) (internal quotation and citation omitted). Thus, monetary damages provide the basis for preliminary injunctive relief in rare and limited circumstances.  <u>Hendricks v. Bank of Am., N.A.</u>, 408 F.3d 1127, 1141 (9th Cir. 2005) (moving party unlikely to recoup damages at judgment based on opposing party's "precarious financial position"); <u>Jensen v. Internal Rev. Serv.</u>, 835 F.2d 196, 198 (9th Cir. 1987) (levy on taxpayer's wages deprived him of the ability "to provide necessities of life for himself and family").  The Ninth Circuit reversed a district court that ordered a preliminary injunction based on the general threat of lost revenue, market value, and goodwill.  <u>Nat'l Football League</u>, 634 F.3d at 1202-03 (finding district court abused its

ORDER – 10

discretion). More often, irreparable harm exists where monetary damages provide inadequate relief, such as cases involving environmental damage or human suffering. E.g., Flowers, 408 F.3d at 1124 (alleged damage to the Sonoran desert); Rodde v. Bonta, 357 F.3d 988, 999 (9th Cir. 2004) (alleged delay or lack of necessary medical treatment, increased pain, and medical complications).

Here, Stonhard alleges that Campton's use of its trade secrets will "degrade the relationship between Stonhard and its customers, as well as usurping Stonhard's business opportunities." Pl.'s Mot. at 29. At oral argument, Plaintiff's counsel suggested that Campton's alleged misappropriation would disrupt its relationships with installers and customers, and as a result it sought injunctive relief to "prevent" future damages claims. Taken together, Stonhard alleges purely economic loss and fails to provide any case authority for its position that such damages warrant the "extraordinary and drastic remedy" of injunctive relief.[9] Mazurek, 520 U.S. at 972. There is no allegation in the pleadings or record that Hi-Tech teeters on the brink of bankruptcy and would be unable to satisfy a judgment against it. Indeed, Hi-Tech's revenues from its Costco work provide effective security against such an occurrence. While Stonhard has demonstrated a strong likelihood of success on the merits (if everything it alleges is proven at trial) and may be entitled to a disgorgement of Hi-Tech's profits, as an appropriate measure of damages, it has failed to show that even a minimal degree of *irreparable* harm exists. At most, Stonhard alleges temporary economic loss which "however substantial, in terms of money . . . [is] not enough" because there are adequate legal remedies. Sampson, 415 U.S. at 90.

---

[9]Stonhard's failure to provide a single case citation as authority for its position in its briefing or at oral argument is particularly striking given the court's previous denial of Stonhard's motion for a temporary restraining order based on its failure to demonstrate irreparable harm.

ORDER – 11

**D.     Balance of the Hardships**

Having found that Stonhard has failed to demonstrate irreparable harm, the court briefly considers the balance of the hardships and finds that it tips in Defendants' favor. Unlike Hi-Tech which employs 17 people and seeks to break into the polymer flooring business, Stonhard employs over 100 Territory Managers alone, and is an industry leader and international corporation.  The parties' disproportionate positions of financial strength suggest that entering the proposed injunction would have a far greater impact on Hi-Tech than not entering it would have on Stonhard.  Further, enjoining Hi-Tech from performing any current or upcoming work for Costco, as proposed by Stonhard, could temporarily grind Costco's construction of multiple warehouses throughout the country to a halt and deprive at least three of Stonhard's installers of work.  Stonhard's customers and installers are free to "vote with their feet" and choose, on their own accord, to work with Campton and Hi-Tech.  The court hesitates to impede third parties' ability to contract with Defendants when Stonhard may later collect monetary damages for any contracts resulting from Campton's misappropriation of Stonhard's trade secrets up to disgorgement of profits.  Moreover, Stonhard could choose to continue working with customers and installers who contract with Hi-Tech, rather than insisting on an exclusive relationship and terminating those who violate it.  Thus, the court finds that Stonhard has failed to carry its burden of making a "clear showing" that preliminary injunctive relief is warranted.  Mazurek, 520 U.S. at 972.

## IV.     CONCLUSION

For the reasons stated above, the court DENIES Plaintiff's motion for a preliminary injunction (Dkt. # 27).  Nonetheless, the court directs the clerk to set this matter for trial on an expedited basis, given the volume of discovery that has already been

ORDER – 12

produced, the continuing nature of the alleged violation, and the seriousness of the allegations.

Dated this 22nd day of August, 2005.

                                                JAMES L. ROBART
                                                United States District Judge

ORDER – 13